**SECURITIES INDUSTRY ASSOCIATION, et al., Plaintiffs, Appellees,**

v.

**Michael J. CONNOLLY, etc., et al., Defendants, Appellants.**

**No. 89–1022.**

United States Court of Appeals, First Circuit.

Heard June 6, 1989.

Decided Aug. 31, 1989.

Thomas A. Barnico, Asst. Atty. Gen., with whom James M. Shannon, Atty. Gen., and Richard M. Brunell, Asst. Atty. Gen., Boston, Mass., were on brief, for defendants, appellants.

Cornish F. Hitchcock and Alan B. Morrison, Washington, D.C., Public Citizen Litigation Group, on brief, for Public Citizen, amicus curiae.

Joseph C. Long, Sp. Counsel, on brief, for North American Securities Administrators Ass'n, Inc., amicus curiae.

Steven W. Hansen with whom Gerald F. Rath, Victor H. Polk, Don E. Gorton III and Bingham, Dana & Gould, Boston, Mass., were on brief, for plaintiffs, appellees.

Marshall E. Hanbury, Gen. Counsel, Chicago, Ill., Kenneth M. Raisler, Gen. Counsel, New York City, and Jay Witkin, Deputy Gen. Counsel, Washington, D.C., on brief, for the Commodity Futures Trading Com'n, amicus curiae.

Before CAMPBELL, Chief Judge, SELYA, Circuit Judge, and CAFFREY,* Senior District Judge.

SELYA, Circuit Judge.

Hypertrophy is the pathologic "overgrowth ... of an organ or part ... resulting from unusually steady or severe use...." Webster's Third New International Dictionary 1114 (1981). Metaphorists seem to find the condition irresistible. Thus, hypertrophy has been used as a partial explanation for the collapse of entire intellectual systems, *e.g.*, Kuhn, The Structure of Scientific Revolutions (2d ed. 1970), and detailed mechanical intellectual artifacts, *e.g.*, Posner, *Goodbye to the Bluebook*, 54 U.Chi.L.Rev. 1343 (1986). We succumb today to the same temptation, for we find the metaphor especially apt in discussing the rampant growth of the civil docket in the United States.

We need not belabor the point. Increased resort to the courts, and the consequent tumefaction of already-swollen court calendars, have received considerable attention, *see, e.g.*, Heydebrand & Seron, *The Rising Demand For Court Services*, 11 Just.Sys.J. 303 (1986); Galanter, *The Day After the Litigation Explosion*, 46 Md.L. Rev. 3 (1986); Lieberman, The Litigation Society (1981), so we merely note the phenomenon and do not comment further upon it. We focus instead on arbitration, a contractual device that relieves some of the organic pressure by operating as a shunt, allowing parties to resolve disputes outside of the legal system. Congress passed the Federal Arbitration Act (FAA or Act), 9 U.S.C. §§ 1–14 (1982), to help legitimate arbitration and make it more readily useful to disputants. The hope has long been that the Act could serve as a therapy for the ailment of the crowded docket. As might be expected, there is a rub: the patient, and others in interest, often resist the treatment.

I

We are asked to decide today if certain regulations, Mass.Regs.Code tit. 950, §§ 12.204(G)(1)(a)–(c) (Regulations), set forth in the appendix hereto, are preempted by the FAA. The Regulations are part of a set which governs the conduct of those who sell securities in the Commonwealth. The provisions at issue were promulgated at one time. Neither party suggested to the district court that any of the provisions might be severable, so we treat them as a unit for purposes of our preemption analysis. *See Clauson v. Smith*, 823 F.2d 660, 666 (1st Cir.1987) (court of appeals will ordinarily eschew consideration of theories not raised below).

The contracts to which the Regulations apply implicate interstate and international commerce, as well as the instrumentalities of that commerce, thus subjecting them to the reach of the FAA. *See* 9 U.S.C. § 1; *see generally Societe Generale de Surveillance, S.A. v. Raytheon European Management and Systems Co.*, 643 F.2d 863, 867 (1st Cir.1981) (the term "commerce" as used in the Act is to be broadly construed). Specifically, the Regulations are aimed at broker-dealers who require customers to sign pre-dispute arbitration agreements (PDAAs) as a concomitant of establishing account relationships. Not coincidentally, many of the major brokerage firms prefer to follow some such praxis. *Cf. Drayer v. Krasner*, 572 F.2d 348, 353–54 (2d Cir.), *cert. denied*, 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978) (discussing industry-wide use of arbitration to resolve disputes between broker-dealers and registered representatives).

* Of the District of Massachusetts, sitting by designation.

The Regulations not only regulate; they do so in a manner patently inhospitable to arbitration. They (i) bar firms from requiring individuals to enter PDAAs as a nonnegotiable condition precedent to account relationships, § 12.204(G)(1)(a); (ii) order the prohibition brought "conspicuously" to the attention of prospective customers, § 12.204(G)(1)(b); and (iii) demand full written disclosure of "the legal effect of the pre-dispute arbitration contract or clause," § 12.204(G)(1)(c).

In Massachusetts, regulation of securities falls within the province of the Secretary of State, who superintends the Securities Division. Immediately upon adoption of the Regulations in September 1988, the Securities Industry Association and ten brokerage firms affiliated with it[1] sued in federal district court seeking a declaration that the Regulations were unconstitutional because they conflicted with the provisions and policies of the FAA. SIA also sought a preliminary injunction barring enforcement of the Regulations. The suit named the Secretary of State and the director of the Securities Division (appellants before us) as defendants. Claiming that the Commonwealth had power to issue the Regulations as part of its concurrent authority to regulate securities transactions, see Mass. Gen.L. ch. 110A, §§ 201, 204 (1984) (governing registration of broker-dealers), appellants stood their ground. Cross-motions for summary judgment were eventually filed. In due course, the district court granted declaratory and injunctive relief in appellees' favor. *Securities Indus. Ass'n v. Connolly*, 703 F.Supp. 146 (D.Mass. 1988). This appeal followed.

## II

### A

■ The Supremacy Clause of Article VI of the federal Constitution prevents the states from impinging overmuch on federal law and policy. *See Louisiana Pub. Serv.*

*Comm'n v. FCC*, 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986). Preemption—the vehicle by which the Supremacy Clause is generally enforced—always boils down to a matter of congressional intent. *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 108 S.Ct. 1145, 1150, 99 L.Ed.2d 316 (1988); *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280, 107 S.Ct. 683, 689, 93 L.Ed.2d 613 (1987); *Wardair Canada, Inc. v. Florida Dep't of Revenue*, 477 U.S. 1, 6, 106 S.Ct. 2369, 2372, 91 L.Ed.2d 1 (1986); *French v. Pan Am Express, Inc.*, 869 F.2d 1, 2 (1st Cir.1989); *Wood v. General Motors Corp.*, 865 F.2d 395, 401 (1st Cir.1988). And, because Congress has not expressly delineated the preemptive reach of the FAA, our task is to determine the extent of any implied preemption vis-a-vis the state's Regulations.

We have acknowledged before that "[t]he concept of implied preemption has a certain protean quality," a circumstance which tends to defeat courts' efforts to establish tidy creedal subcategories. *French*, 869 F.2d at 2. Yet, although we continue to "abjure taxonomy for taxonomy's sake," *id.*, it is sometimes helpful to sketch the borders of the doctrine by reference to commonly used descriptions. Thus, it has been said that implied preemption prospers when Congress intends its enactments "to occupy a given field to the exclusion of state law." *Schneidewind*, 108 S.Ct. at 1150. That is not the case here: Congress did not want the FAA to occupy the entire field of arbitration law. *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.*, —— U.S. ——, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989); *New England Energy, Inc. v. Keystone Shipping Co.*, 855 F.2d 1, 4 (1st Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989). State law may also be preempted "when it actually conflicts with federal law." *Schneidewind*, 108 S.Ct. at 1150;

---

**1.** The ten houses comprise Dean Witter Reynolds, Inc., Donaldson, Lufkin & Jenrette Securities Corp., Drexel Burnham Lambert, Inc., Fidelity Brokerage Services, Inc., Kidder Peabody & Co., Merrill Lynch, Pierce, Fenner & Smith, Inc., Paine Webber Inc., Prudential–Bache Securities Inc., Shearson Lehman Hutton, Inc., and Smith Barney, Harris Upham & Co. We refer to them and the trade association plaintiff, collectively, as "SIA" or "appellees."

*see also Perry v. Thomas,* 482 U.S. 483, 491, 107 S.Ct. 2520, 2526, 96 L.Ed.2d 426 (1987). In this respect, substance takes precedence over form; a direct, facial contradiction between state and federal law is not necessary to catalyze an "actual[ ] conflict" within the doctrinal parameters of the Supremacy Clause.

■■■ Whatever labels may be affixed, the pivot upon which our inquiry turns remains constant: where Congress has failed explicitly to detail the dimensions of displacement, courts must decide if "the state law disturbs too much the congressionally declared scheme...." *Palmer v. Liggett Group, Inc.,* 825 F.2d 620, 626 (1st Cir.1987); *see also French,* 869 F.2d at 2 (adopting a practical preemption analysis which focuses "on the effect which the challenged enactment will have on the federal plan"). Put another way, a state law or regulation cannot take root if it looms as an obstacle to achievement of the full purposes and ends which Congress has itself set out to accomplish. *Schneidewind,* 108 S.Ct. at 1151; *California Coastal Comm'n v. Granite Rock Co.,* 480 U.S. 572, 107 S.Ct. 1419, 1425, 94 L.Ed.2d 577 (1987); *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984); *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

### B

■■■ Here, then, the critical inquiry is whether the FAA is an enactment which Congress meant to remain relatively unfettered; and if so, whether the Regulations intrude impermissibly. We approach our task mindful both that interpretation of a statute's meaning must start with the text itself, *United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986), and that the language chosen by Congress must be accorded its ordinary meaning, *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). In this instance, the relevant statutory phraseology is not technical, embodies conventional terms, and has the virtue of brevity:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The language sweeps broadly and brooks little reservation. We must, therefore, be chary of a narrowing construction, lest such an interpretive modality clog the channel Congress has opened. *See Volt,* 109 S.Ct. at 1254–55.

Reluctance to shrink the scope of section 2 seems particularly well advised given the Supreme Court's resounding endorsement of the "ordinary language" technique in construing the FAA. *See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967). The Court has concluded that this approach comports with Congress's "unmistakably clear ... purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction." *Id.* Nor is *Prima Paint* in any sense aberrational; just this year, in the course of overruling *Wilko v. Swan,* 346 U.S. 427, 74 S.Ct. 182, 98 L.Ed. 168 (1953) (a decision voiding certain PDAAs under § 14 of the Securities Act of 1933), the Court again emphasized "the strong language" of the FAA and noted the heavy burden borne by opponents of the arbitral alternative. *See Rodriguez de Quijas v. Shearson/American Express, Inc.,* —— U.S. ——, 109 S.Ct. 1917, 1921, 104 L.Ed.2d 526 (1989).

### C

Because the language of the Act seems clear, and its meaning plain, we are not obliged to plumb the Congress's collective consciousness to ascertain legislative intent. *James,* 478 U.S. at 606, 106 S.Ct. at

3121; *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981). It nevertheless seems prudent to do so, if only "[a]s a check upon our reading of the statute." *Kwatcher v. Massachusetts Service Employees Pension Fund*, 879 F.2d 957, 960 (1st Cir.1989).

In recent decades, the Supreme Court has faced a number of disputes involving the FAA. In case after case, the Justices have read the Act's legislative history with an avuncular eye; as the court below perspicaciously observed, "[r]ecent history has found the Supreme Court offering endorsements of the arbitration process by expansive statements of the intent of Congress in passing the Federal Arbitration Act." 703 F.Supp. at 150–51 (citing representative cases). We have lately witnessed yet another illustration of this trend. *See Rodriguez de Quijas*, 109 S.Ct. at 1920 (acknowledging the Court's "current strong endorsement of the federal statutes favoring [arbitration]"). Although an arbitral remedy has not invariably prevailed, *see, e.g., Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 51–52, 94 S.Ct. 1011, 1021–1022, 39 L.Ed.2d 147 (1974) (Title VII employment discrimination claim could be litigated in a judicial forum notwithstanding PDAA), the Court has almost always given the Act a reading which is both broad and deep.

Congress, we are told, enacted the FAA to relieve parties from what, even two-thirds of a century ago, was characterized as " 'the costliness and delays of litigation.' " *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 220, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985) (quoting H.R. Rep. No. 96, 68th Cong., 1st Sess. 2 (1924)). Common-law courts had jealously guarded

the sovereign's perceived prerogative to handle disputes among its constituents, preserving the courts' jurisdiction to resolve controversies once they had been solemnized. *Byrd*, 470 U.S. at 220 n. 6, 105 S.Ct. at 1242 n. 6. The FAA was enacted to overcome this "anachronism." *Id.* In harmony with that purpose, the Act declares "a liberal federal policy favoring arbitration agreements." *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983); *see also Rodriguez de Quijas*, 109 S.Ct. at 1919; *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985). Such a policy is desirable because it best effectuates the "congressional desire to enforce agreements into which parties had entered." *Byrd*, 470 U.S. at 220, 105 S.Ct. at 1242. At the same time, courts must be on guard for artifices in which the ancient suspicion of arbitration might reappear. *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987); *Byrd*, 470 U.S. at 221, 105 S.Ct. at 1242.[2]

In sum, the legislative history of the FAA, like its text, indicates that the courts must receive the Act hospitably and defend its mechanisms vigilantly and with some fervor.

### D

■ The metaphors used to describe the Court's interpretations are somewhat varied, but their common denominator is a principle of rigorous equality under 9 U.S.C. § 2.[3] Given this interpretive model,

---

**2.** We think that the Court, by taking the formidable step of overruling its own precedent, has demonstrated how tightly impulses hostile to arbitration must be constrained in order to remain faithful to Congress's mandate. *See Rodriguez de Quijas*, 109 S.Ct. at 1920 (in part, *Wilko* must fall because it is "pervaded by ... 'the old judicial hostility to arbitration' ") (citation omitted).

**3.** *Volt* is not to the contrary. There, the Court ruled that "interpreting a choice-of-law clause to make applicable state rules governing the conduct of arbitration—rules which are manifestly

designed to encourage resort to the arbitral process—simply does not offend the rule of liberal construction ... nor does it offend any other policy embodied in the FAA." 109 S.Ct. at 1254 n. 5. But, the choice-of-law provision in *Volt* did not impinge on the validity or enforceability of the arbitral contract. *See id.* at 1254. The California regulation filled in an interstice in the FAA, *id.* at 1254 n. 5, whereas the Regulations here at issue plainly undermine the presumption of validity that the Act meant to confer on arbitration contracts generally. *See Perry*, 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9 (making distinctions between choosing which

and the statute's twofold use of the term "any"—it is, after all, "difficult to imagine broader language," *James*, 478 U.S. at 604, 106 S.Ct. at 3121 (footnote omitted)—the words of 9 U.S.C. § 2 must be ceded their full import. What seems beyond dispute at this juncture is that no state may simply subject arbitration to individuated regulation in the same manner as it might subject some other unprotected contractual device (say, a prescriptive period or exculpatory clause contained within a private contract). Thus, for example, the Eighth Circuit struck down Missouri's effort to require that contracts highlight the existence of arbitration clauses by use of 10–point capital letters, *Webb v. R. Rowland & Co.*, 800 F.2d 803, 806 (8th Cir.1986), and earlier refused to honor a state requirement that arbitration agreements bear an attorney's acknowledgement attesting that all parties had been informed of the agreement's effects, *Collins Radio Co. v. Ex–Cell–O Corp.*, 467 F.2d 995, 997 (8th Cir.1972). Any similar limitary approach would seemingly defeat the very aim of the Act, allowing states to revivify the ancient jurisdictional antagonism toward arbitration by cloaking it in regulatory garb. At the very least, such enmity, howsoever manifested in state law,[4] is preempted. *Volt*, 109 S.Ct. at 1253; *Perry*, 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9; *Mitsubishi Motors*, 473 U.S. at 626–27, 105 S.Ct. at 3353–54; *Byrd*, 470 U.S. at 219–21, 105 S.Ct. at 1241–42; *Southland Corp. v. Keating*, 465 U.S. 1, 18–19, 104 S.Ct. 852, 862–63, 79 L.Ed.2d 1 (1984); *Moses Cone*, 460 U.S. at 24–25, 103 S.Ct. at 941, 942; *Prima Paint*, 388 U.S. at 404 n. 12, 87 S.Ct. at 1806 n. 12; *New England Energy*, 855 F.2d at 4–5.

Appellants conceded before the district court, 703 F.Supp. at 152, and on appeal,

that the Regulations apply only to arbitration agreements. They suggest, however, that this bespeaks no unfriendliness: the Commonwealth treats arbitration agreements like other contracts between businesses and consumers, that is, it regulates them as extensively as necessary for the public weal. In our view, that self-congratulatory casuistry will not wash. Indeed, we think it evident that it was precisely this sort of categorization error which Congress sought to cure when it enacted the FAA.

In creating a body of substantive law covering arbitration, Congress barred the states from making determinations about arbitration contracts that the states remained free to make about, say, used car sales. *Perry*, 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9; *McMahon*, 482 U.S. at 226, 107 S.Ct. at 2337. Even if regulators find industry-wide practices that would be grounds for voiding arbitration agreements at common law, *e.g.*, fraud or coercion, any *separate* regulatory action or sanction singling out arbitration agreements from contracts generally would be preempted. PDAAs may be void on these grounds, exactly as would contracts of other types conceived fraudulently or in unduly coercive circumstances—no more, no less. The FAA prohibits a state from taking more stringent action addressed specifically, and limited, to arbitration contracts.

That is not to say that a state can do nothing about a perceived problem. The Commonwealth's powers remain great, so long as used evenhandedly. The FAA does not prohibit judicial relief from arbitration contracts which are shown to result from fraud or enormous (unfair) economic imbalance of the sort sufficient to avoid con-

---

law of unconscionability applies and not whether law of unconscionability applies to arbitration); *see also New England Energy*, 855 F.2d at 4–5 (states may enact regulations to fill gaps left by the FAA).

**4.** That the restriction is administrative rather than legislative or judge-made in no way validates appellants' maneuver. The gravamen of the FAA is to preserve the arbitral bargain

against external onslaughts manifesting hostility to arbitration, whatever their genesis. The only excepted areas are those where Congress (expressly, by fair implication, or by delegation) has itself exhibited a preference for some other forum or rule. *See McMahon*, 482 U.S. at 226–27, 107 S.Ct. at 2337–38; *Kroog v. Mait*, 712 F.2d 1148, 1154 n. 5 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984).

tracts of all types.[5] *Rodriguez de Quijas,* 109 S.Ct. at 1921. "Thus state law, whether of legislative or judicial origin, is applicable [and not preempted] *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally." *Perry,* 482 U.S. 492 n. 9, 107 S.Ct. at 2527 n. 9 (emphasis in original). Massachusetts could also pass legislation declaring all contracts of adhesion presumptively unenforceable. *See* Rakoff, *Contracts of Adhesion: An Essay in Reconstruction,* 96 Harv.L.Rev. 1173, 1248 n. 239 (1983). Such a rule would apply to arbitration contracts, *among others.* But Massachusetts may not say (judicially, legislatively, or in a regulatory mode) that "adhesion contracts are especially bad when arbitration is included, so we will therefore ban, or place gyves and shackles upon, only those adhesive contracts which contain arbitration clauses." That kind of value judgment is foreclosed precisely because the FAA ordains that the state's appulse toward arbitration agreements must be the same as its approach to contracts generally. *Perry,* 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9; *McMahon,* 482 U.S. at 226, 107 S.Ct. at 2337.

### E

■ Appellants also urge us to find that, notwithstanding the general rule, Congress carved out an exception to the Act by permitting states concurrently to regulate securities transactions. We need not linger long over this asseveration. The Court has recently addressed the theoretical overlap between securities regulation and the FAA, holding that claims under section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), could be the subjects of arbitration. *Rodriguez de Quijas,* 109 S.Ct. at 1922. The same holds true for claims arising under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). *McMahon,* 482 U.S. at 227–28, 238, 107 S.Ct. at 2337–38, 2343. There, the Court noted that "[w]hen Congress enacted the Exchange Act in 1934, it did not specifically address the question of the arbitrability of § 10(b) claims." *Id.* at 227, 107 S.Ct. at 2338. Congress's failure explicitly to resolve the potential conflict between the FAA and the 1933 and 1934 Acts has impelled the Court to determine the proper boundaries. In so doing, the Justices set forth an analytic framework which we find important to our inquiry.

Starting with the premise that the FAA was intended to have the full breadth apparent from its plain language, the Court noted that the 1934 Act "provides no basis for disfavoring agreements to arbitrate statutory claims by skewing the otherwise hospitable inquiry into arbitrability." *McMahon,* 482 U.S. at 226, 107 S.Ct. at 2337 (quoting *Mitsubishi Motors,* 473 U.S. at 627, 105 S.Ct. at 3354); *see also Rodriguez de Quijas,* 109 S.Ct. at 1920–21. If claims actually based on a federal statute are not sacrosanct, then we can see no reason why ordinary contractual relations between customers and broker-dealers would not be accessible to the reach of the FAA. Such dealings strike us as well within the universe of possible topics "otherwise hospitable" to arbitration. As such, they are subject to the full force of the FAA's core command: that an arbitration contract be treated like "any contract." 9 U.S.C. § 2.

Simply put, nothing in the Securities Act, the Exchange Act, or the grant of concurrent power to the states to regulate securities manifests a congressional intent to limit or prohibit waiver of a judicial forum for a particular claim, or to abridge the sweep of the FAA. *Rodriguez de Quijas,* 109 S.Ct. at 1920; *McMahon,* 482 U.S. at 226, 107 S.Ct. at 2337. And we are mindful that: "The burden is on the party opposing arbitration ... to show that Congress intended to preclude a waiver of judicial rem-

---

**5.** Although any fraudulent, adhesive, or economically coerced agreement to arbitrate would be challengeable, the Supreme Court has suggested that such challenges must not only be brought on grounds common to contracts generally, but must also be proven on the facts of the individual case, not automatically shunted to one side according to practices governing the formation of arbitration agreements as a class of contracts. *See Rodriguez de Quijas,* 109 S.Ct. at 1921.

edies for the statutory rights at issue." *McMahon*, 482 U.S. at 227, 107 S.Ct. at 2337; *see also Mitsubishi Motors*, 473 U.S. at 628, 105 S.Ct. at 3354 (parties should be held to arbitral bargain "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue"); *Page v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 806 F.2d 291, 295 (1st Cir.1986) (court must "enforce the [arbitral] agreement *unless ... the Congressional intent in enacting the [right-creating] statute was to preclude the waiver of judicial remedies*") (emphasis in original). That burden has not been carried.

Nor are we willing to infer implicit congressional approval of the Commonwealth's policy simply because the Commodities Futures Trading Commission (CFTC) has adopted rules, *see* 17 C.F.R. § 180.3 (1988), not dissimilar in spirit from the Massachusetts regulations. The same holds true of recent Securities and Exchange Commission (SEC) activities, including the SEC's approval of rules submitted by three self-regulatory organizations requiring brokers to discuss customers' rights under mandatory arbitration agreements and to include language in arbitration clauses informing customers that they are waiving judicial fora. *See* Order Approving Proposed Rule Changes, 54 Fed.Reg. 21,144 (1989). Both CFTC's rulemaking and the SEC's acquiescence are products of federal, not state, authority. That is a critical distinction. *See McMahon*, 482 U.S. at 226, 107 S.Ct. at 2337 (the "Act's mandate may be overridden by a contrary *congressional* command") (emphasis supplied); *Felkner v. Dean Witter Reynolds, Inc.*, 800 F.2d 1466, 1468 n. 3 (9th Cir.1986). Congress has not structured a similar arbitration exception for securities in general and certainly not for state regulation of securities in particular. *Kroog v. Mait*, 712 F.2d 1148, 1154 n. 5 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984).

We go one extra step. If Congress meant to exempt the regulation of securities from the FAA's sphere of influence, "such an intent 'will be deducible from [the statute's] text or legislative history,' or from an inherent conflict between arbitration and the statute's underlying purpose." *McMahon*, 482 U.S. at 227, 107 S.Ct. at 2337 (citations omitted); *accord Rodriguez de Quijas*, 109 S.Ct. at 1920. There is nothing in the language of the Securities Act, the Exchange Act, or the pertinent legislative history, which points in such a direction. By the same token, appellants have utterly failed to demonstrate any inherent conflict or to suggest any valid reason why "arbitration is inadequate to protect the substantive rights at issue." *McMahon*, 482 U.S. at 229, 107 S.Ct. at 2339. The opposite seems true: any remnants of *Wilko*'s "outmoded presumption of disfavoring arbitration proceedings" have been laid to rest, once and for all. *Rodriguez de Quijas*, 109 S.Ct. at 1920.[6]

The long and short of it is that we can find no evidence of a clear congressional command to override the unambiguous proarbitration mandate of the FAA in the securities field.

### III

#### A

■ Ordinarily, our determination that the Regulations conflict with the requirement that arbitration contracts be treated on a par with contracts generally would end the matter. Here, however, there is a further wrinkle. On their face, the Regulations do not govern PDAAs at all. Rather, they purport to address broker-dealers who would require customers to sign PDAAs. This difference, appellants tell us, is determinative.

The dialectic is too clever by half. Even if we grant the claim that a contract made in the face of such an ethical order to a contracting party would be enforceable—a claim open to considerable doubt, and upon

---

**6.** *McMahon* adequately evinces the point. There, only a dissenter, not the Court's majority, felt that arbitration could fail to protect an investor's substantive rights. 482 U.S. at 257–66, 107 S.Ct. at 2353–58 (Blackmun, J., dissenting).

which we express no opinion [7]—the Regulations would still be preempted. Without recognizing it, appellants appear to have trapped themselves in a trick box. As the district court noted and documented, unconscionability is the standard for voluntariness in Massachusetts. 703 F.Supp. at 152–53. Either the Regulations create a stricter standard for PDAAs, or they are functionally meaningless. If the former, then the Regulations, by requiring what is not generally required to enter contracts in the Commonwealth, e.g., certain negotiations, explanations, and disclosures, inhibit a party's willingness to create an arbitration contract or undermine the contract's enforceability (if the party proceeds notwithstanding the edict). By itself, such an ethical mandate is sufficient to lead us to rule that the Regulations go too far.

State law need not clash head on with a federal enactment in order to be preempted. If state law "stands as an obstacle to the accomplishment of the full purpose and objectives of Congress," it must topple. Schneidewind, 108 S.Ct. at 1151 (citations omitted); see also French, 869 F.2d at 7 (state statute preempted when "too discommoding" to federal scheme); Palmer, 825 F.2d at 629 (state tort liability preempted when enforcement would be "seriously disruptive to the congressionally calibrated balance of national interests"). In enacting the FAA, Congress evinced an unmistakable "federal policy favoring arbitration agreements," one which was to be applied liberally. Moses Cone, 460 U.S. at 24, 103 S.Ct. at 941. Courts are to do so even where "state substantive or procedural policies" run to the contrary, always resolving "any doubts concerning the scope of arbi-

trable issues ... in favor of arbitration." Id. at 24–25, 103 S.Ct. at 941. Wherever there is "an allegation of waiver, delay, or a like defense to arbitrability," we must heed the underlying federal interest. Id. at 25, 103 S.Ct. at 941. The lesson is entirely clear: "A state law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with [the equality] requirement of § 2." Perry, 482 U.S. at 492 n. 9, 107 S.Ct. at 2527 n. 9.[8] That is to say, courts must follow congressional intent and "foreclose state legislative attempts to undercut the enforceability of arbitration agreements." Southland, 465 U.S. at 16, 104 S.Ct. at 861. The legal standard is whether the Regulations take their meaning from the fact that a contract to arbitrate is at issue, or frustrate arbitration, or provide a defense to it. If so, the federal policy requires that we resolve all doubts in favor of arbitration, finding the Regulations preempted.

In this instance, we conclude as a matter of law that the Regulations actually conflict with the FAA and the federal policy embedded therein. The Regulations leave no room for speculation: it is unarguable from their wording that they derive their essential meaning from the fact that a contract to arbitrate is at issue. As the district court noted, the Commonwealth's wistful assertion that the Regulations are not addressed to the validity and enforceability of PDAAs "can be maintained only by assuming that no provision of state law other than one directly governing contract validity or enforceability comes within the preemptive reach of the Arbitration Act." 703 F.Supp. at 156. That assumption is so

---

7. It is hornbook law that one who violates a licensing statute—which, as here, is not a revenue measure, but a public-protection statute—is generally not allowed to enforce the contract. The usual case arises where an unlicensed party performs services requiring a license. See, e.g., Shinberg v. Bruk, 875 F.2d 973, 976 (1st Cir. 1989) (attorney not licensed as real estate broker barred from claiming finder's fee). In this situation, however, the terms of the contract constitute the basis for the ethical proscription. Thus, the closer analogy would seem to be that if, "in making and performing [the contract] he defrauded the other party, the latter has a good defense...." 6A A. Corbin, Corbin on Con-

tracts, § 1510 (1962); see also J. Calamari & J. Perillo, Contracts § 22–7 (2d ed. 1977); Restatement (Second) of Contracts § 181 (1981). Moreover, as the district court pointed out, 703 F.Supp. at 149, Mass.Gen.L. ch. 110A, § 410(f) would likely prevent a broker from enforcing a contract made in violation of the Regulations.

8. Technically, as appellants are quick to note, the statements of the Perry Court contained in footnote 9 of its opinion are dicta. But, we find them to be considered dicta, reflective of the applicable rule of law.

seriously flawed that it cannot be countenanced.

The Regulations must also fall because they are at odds with the policy which infuses the FAA. The power to suspend a license is much more than a shift in costs; it is the economic equivalent of the death penalty. The worry that requiring a PDAA might forfeit a firm's ability to function as a broker-dealer at all is an obstacle of greater proportions even than the chance that, in a given dispute, an arbitration agreement might be declared void. To the extent that the substantive state policy to foster "ethical" broker-dealers, embodied in the Regulations here at issue, conflicts with the federal policy to "favor[ ] arbitration agreements," *Moses Cone*, 460 U.S. at 24, 103 S.Ct. at 941, it is preempted.

### B

■■■■■ A policy designed to prevent one party from enforcing an arbitration contract or provision by visiting a penalty on that party is, without much question, contrary to the policies of the FAA. But, there is at least one other way in which the Massachusetts policy would erode the goals of the Act. The Regulations are aimed at nonnegotiable "standard-form" PDAAs. Arbitration is a positive good in the eyes of courts and Congress not just because it relieves crowded calendars, but because it relieves an often unnecessary elaboration of social practices. As the Court has stated, resort to arbitration "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Mitsubishi Motors*, 473 U.S. at 628, 105 S.Ct. at 3354. We must, therefore, be vigilant lest we recreate even the beginnings of hypertrophy in the formation of arbitration contracts. The Regulations demand exactly the kind of inefficiency which arbitration and standard-form contracts (generally legitimate under Massachusetts law) are designed to minify.[9] By depriving broker-dealers of the opportunity to employ form contracts, even were there no penalty attached to their use, Massachusetts has acted to undercut the policies of simplicity and expedition that characterize the arbitral alternative.

### IV

The Commonwealth may well be correct that PDAAs ought to be arrived at with greater negotiation and disclosure between broker-dealers and customers than currently takes place. That judgment, however, is not the Commonwealth's to make, at least in its current embodiment, for it singles out arbitration in an impermissible way. The states are forbidden from critical scrutiny expressed in a fashion which might mask historic hostility toward arbitration. Congress sought to avoid having that possibility come to fruition, choosing instead to emphasize and endorse arbitral efficiencies. That value judgment was within the congressional domain—and only Congress, not the states, may create exceptions to it.

That is not to say, of course, that a state must permit broker-dealers to sail as close to the wind as their consciences (or lack thereof) might permit. Massachusetts has a plenitude of lawful weapons in its ethical armamentarium to preserve the integrity of the securities business as conducted in the Commonwealth and to protect consumers. *Cf., e.g., Volt*, 109 S.Ct. at 1254. But because the Regulations treat standard-form PDAAs in the securities industry more severely than standard-form contracts are generally treated under Massachusetts law, and because the policies underlying the Regulations, and their method of enforcement, conflict with the national policy favoring arbitration, the state scheme is too discommoding to the federal plan. The Regulations are, therefore, preempted.

---

**9.** The Court has not seen fit to question use of standard-form contracts in circumstances where parties having apparently unequal bargaining power have agreed to arbitrate. *See, e.g., Rodriguez de Quijas*, 109 S.Ct. at 1921; *Southland*, 465 U.S. at 4, 104 S.Ct. at 855; *see also Webb*, 800 F.2d at 807 ("The use of a standard form contract between two parties of admittedly unequal bargaining power does not invalidate an otherwise valid contractual provision.").

We need go no further.[10]   The judgment of the district court must be

*Affirmed.*

## APPENDIX

*12.204: Denial, Revocation, Suspension, Cancellation, and Withdrawal of Registration*

[(a)(1) through (a)(2)(F): Reserved]

(G) *Dishonest or unethical practices in the securities business.*

1. *Broker-dealers.*   Each broker-dealer shall observe high standards of commercial honor and just and equitable principles of trade in the conduct of its business.   Act and practices, including but not limited to the following, are considered contrary to such standards and constitute dishonest or unethical practices which are grounds for denial, suspension or revocation of registration or such other action authorized by law:

a.   Requiring on or after January 1, 1989, that a customer located in Massachusetts, other than a customer that is an institutional investor or financial institution specified in 950 CMR 14.-401(e), execute either a mandatory predispute arbitration contract or a customer agreement containing a mandatory pre-dispute arbitration clause that is a non-negotiable precondition to effecting transactions in securities for the account of the customer or opening a securities cash account or margin account by the customer with such broker-dealer;

b.   Requesting on or after January 1, 1989, that a customer located in Massachusetts execute either a mandatory pre-dispute arbitration contract or a customer account agreement containing a pre-dispute arbitration clause where the contract or agreement fails

to conspicuously disclose that the execution of the contract or agreement cannot be made a non-negotiable precondition to the opening by the customer of a securities account with the broker-dealer;

c.   Requesting on or after January 1, 1989, that a customer located in Massachusetts execute either a mandatory pre-dispute arbitration contract or a customer account agreement containing a pre-dispute arbitration clause without fully disclosing to the customer in writing the legal effect of the pre-dispute arbitration contract or clause;

d.   Being found by a court of competent jurisdiction to have violated M.G.L. c. 93A in connection with the sale of securities; and

e.   Being temporarily or permanently enjoined by any court of competent jurisdiction from violating M.G.L. c. 93A in connection with the sale of securities.

---

10.   We do not address appellants' contention that the district court erred in denying their motion to defer *brevis* disposition pending further discovery.   *See* Fed.R.Civ.P. 56(f).   According to a supporting affidavit, appellants sought the delay to "assess the impact of the regulations on broker and customer behavior."   The motion was not directed at discovery of any facts material to the legal question—whether the

FAA preempts the Regulations—which we, like the lower court, have found determinative. Thus, the Rule 56(f) motion is, for our purposes, beside the point.   *See Paterson–Leitch Co. v. Massachusetts Municipal Wholesale Elec. Co.,* 840 F.2d 985, 988 (1st Cir.1988) (to be effective, Rule 56(f) motion must show that facts likely exist which, if obtained, will "engender an issue both genuine and material").