**James GRAY and John Simas, Plaintiffs,**

v.

**QUAKER FABRIC CORPORATION OF FALL RIVER, QFC Acquisition Corp., Defendants.**

Civ. A. Nos. 91–12624–Y, 92–10067–Y.

United States District Court, D. Massachusetts.

Dec. 23, 1992.

Orlando F. Abreu, Fall River, MA, for John Simas, plaintiff.

Orlando F. de Abreu, Taunton, MA, for James N. Gray, plaintiff.

Neil Jacobs, Ann K. Bernhardt, Daniel W. McCarthy, Hale & Dorr, Boston, MA, for defendants.

### MEMORANDUM [1]

YOUNG, District Judge.

In 1974 Congress enacted the Employee Retirement Income Security Act ("ERISA"), 88 Stat. 829, as amended, 29

---

1. The Court's rulings were delivered on December 11, 1992 from the bench of the Northeastern University School of Law moot courtroom. The two judgments (and the order of remand in the case of Simas) entered on December 21 and

U.S.C. § 1001 *et seq.*, implementing a national policy to safeguard employees' retirement benefits. In 1989, the Massachusetts legislature enacted Mass.Gen.L. ch. 149, § 183, Mass.Stat.1989, ch. 242 § 10, the so-called "tin parachute" law, expressing a commonwealth policy requiring a measure of protection for employees who lose their jobs following a corporate takeover. While these two policies intuitively appear not to conflict and are, indeed, complimentary, Congress has enacted such a sweeping preemption provision in ERISA as to fully occupy the field of employee benefit plans and exclude most state regulation in the area. The central issue in this case concerns whether the Massachusetts tin parachute law impermissibly encroaches on the federally controlled field of employee benefit plans.[2]

Here, James Gray ("Gray") and John Simas ("Simas"), former employees of Quaker Fabric Corporation of Fall River ("QFC Fall River"), brought suit in the Massachusetts Superior Court sitting in and for the County of Bristol against QFC Fall River and QFC Acquisition Corporation ("QFC Acquisition Corp") (collectively, "Quaker") for severance benefits allegedly due under Mass.Gen.L. ch. 149 § 183.[3] Simas also

December 22, 1992. This memorandum more fully explicates the Court's reasoning.

2. While this case involves a legislative provision expressly providing for federal pre-emption, it is perhaps germane to note that implied federal pre-emption of matters once thought to be within the competence of state legislatures and courts has been especially marked and pervasive in this circuit. *See, e.g., Securities Industry Ass'n v. Connolly,* 883 F.2d 1114 (1st Cir.1989), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2 742 (1990) (federal arbitration act impliedly pre-empts state guarantee of jury trial in securities disputes); *Wood v. General Motors Corp.,* 865 F.2d 395 (1st Cir.1988) *cert. denied,* 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 782 (1990) (despite savings clause, federal legislation detailing automobile design features impliedly pre-empts state tort remedies). More recently, however, the Supreme Court has narrowed the doctrine of implied federal pre-emption. *Cipollene v. Liggett Group, Inc.,* — U.S. —, —, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992). No such narrow construction has been indicated for the express provision for federal ERISA pre-emption. *See, e.g., District of Columbia v. Greater Washington Bd. of Trade,* — U.S. —, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992).

3. The statute provides in pertinent part:

**§ 183. Severance pay upon termination following transfer of control of employer; definitions.**

(a) As used in this section, the following words, unless the context clearly requires otherwise, shall have the following meanings:—

"Termination of employment", the involuntary termination of an employee's employment consistent with the eligibility standards for unemployment benefits under *section twenty-five of chapter one hundred and fifty-one A.*

"Transfer of control", a transaction or series of transactions as a result of which any person ... is or becomes the "beneficial owner" ... directly or indirectly, of securities of a control transferor representing fifty percent or more of the control transferor's then outstanding voting securities; ....

(b) Any employee of a control transferor whose employment is terminated within twenty-four calendar months after the transfer of control of his employer is entitled to a one time lump sum payment from the control transferee equal to the product of twice his weekly compensation multiplied by each completed year of service. Such severance pay to eligible employees shall be in addition to any final wage payment to the employee and shall be made within one regular pay period after the employee's last day of work.

(c) Any employee of a control transferor whose employment is terminated within the shorter of the following periods prior to a control transfer: (1) twelve calendar months; or (2) the period of time between which the control transferee obtained a five percent interest in the voting securities of the control transferor and consummated a control transfer by obtaining a fifty percent or greater interest pursuant to a transfer of control as defined herein, is entitled to a one time lump sum payment from the control transferee equal to the product of twice his weekly compensation multiplied by each completed year of service. Such severance pay to eligible employees shall be in addition to any final wage payment to the employee and shall be made within four regular pay periods after such transfer of control.

(d) There shall be no liability for the one time payment to an otherwise eligible employee if:

(1) The employee is covered by an express contract providing for such payment in the event of termination of employment in excess of that provided by this section;

(2) The employee has been employed by the control transferor for less than three years; ....

The standard under Mass.Gen.L. ch. 151A § 25 reads:

alleged a claim for "wrongful discharge." Upon removal to this Court, Quaker contends that the severance claims of both Gray and Simas are pre-empted by ERISA, and that Simas failed to exhaust administrative remedies with regard to his wrongful discharge claim. Quaker, Gray, and Simas have submitted cross-motions for summary judgment.

## I. FACTUAL BACKGROUND

QFC Fall River is a Massachusetts corporation that manufactures and distributes fabric products. QFC Acquisition Corp is a Delaware corporation which merged with QFC Fall River on September 20, 1989, when QFC Acquisition Corp purchased 95% of QFC Fall River's outstanding shares. As of September 1992, Quaker employed approximately 1350 employees in Massachusetts, California, Illinois, Mississippi, North Carolina, and Texas.

Gray was employed by QFC Fall River from 1978 until February 1, 1990, when he was terminated from his position as shift supervisor for improperly verifying his brother's time card. Simas was employed by QFC Fall River from 1971 until December 5, 1989, when he was terminated for allegedly leaving work early on December 4, 1989. Both Gray and Simas applied to the Department of Employment and Training of the Commonwealth of Massachusetts ("Department") for unemployment benefits and were ultimately determined to be eligible for such benefits. Specifically, the Department determined in separate proceedings that the discharges of Gray and Simas were "not solely attributable" to willful misconduct as defined by Mass. Gen.L. ch. 151A, § 25(e)(2).

Since December 1988, QFC Fall River has maintained a severance pay program for employees exempt from coverage of the Fair Labor Standards Act (the "Exempt Employees Salary Continuation Policy" or "Severance Pay Policy"). This package provides for one week of salary continuation for each year of service for eligible employees upon termination with an exception for employees terminated for cause or as a result of retirement, death or voluntary resignation. Gray was covered under this policy at the time of his termination, but Simas apparently was not.[4]

Neither Gray nor Simas has received any severance pay to date.

## II. PROCEDURAL HISTORY

In September 1991, Gray filed a complaint in Massachusetts Superior Court alleging a right to severance pay equal to 24 weeks' wages under Mass.Gen.L. ch. 149, § 183(b), which entitles an employee terminated after or shortly before a "change in company control" to a lump-sum severance payment equal to twice the employee's weekly compensation multiplied by his total years of service. Simas filed a similar claim for 38 weeks' wages in December 1991, also adding a second count for "wrongful discharge." Quaker subsequently removed both cases to this Court on the grounds that the claims arose under ERISA, and this Court subsequently denied the plaintiffs' motions to remand.

Quaker, Gray, and Simas have submitted cross-motions for summary judgment. Quaker does not dispute the fact that a "change in control" occurred, but contends that the section 183 claims are pre-empted by ERISA. Quaker also contends that Simas failed to exhaust his administrative remedies with regard to his wrongful discharge claim.

## III. ERISA PRE-EMPTION

Section 514(a) of ERISA provides that "the provisions of [ERISA] shall supersede any and all state laws insofar as they may now or hereafter relate to any employee

---

No ... benefits shall be paid to an individual under this chapter ...

...

(e) ... after he has left his work (1) voluntarily without good cause attributable to the employing unit or its agent (2) by discharge shown to the satisfaction of the director to be attributable solely to deliberate misconduct in wilful disregard of the employing unit's interest or (3) because of conviction of a felony or misdemeanor.

**4.** To date, neither Gray nor Simas has sued for recovery under Quaker's Severance Pay Policy.

benefit plan." 29 U.S.C. § 1144(a). The words "relate to" have been construed expansively: a law "relates to" an employee benefit plan " 'if it has a connection with or reference to such a plan[,]' ... 'even if the law is not specifically designed to affect such plans, or the affect is only indirect,' and even if the law is 'consistent with ERISA' substantive requirements.' " *District of Columbia v. Greater Washington Bd. of Trade*, — U.S. —, —, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992) (citations omitted). In addition, it is clear that "plans to pay employees severance benefits ... are employee welfare benefit plans within the meaning of [ERISA]," whether funded from an employer's general assets or from a special trust. *Massachusetts v. Morash*, 490 U.S. 107, 116, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 17, 107 S.Ct. 2211, 2220, 96 L.Ed.2d 1 (1987). Nevertheless, the Supreme Court has made clear that ERISA pre-empts only those state laws relating to "employee benefit *plans*," and does not pre-empt state laws relating only to "employee *benefits*." *Fort Halifax*, 482 U.S. at 7–8, 11–12, 107 S.Ct. at 2215–16, 2217–18 (emphasis in original). Thus, these severance pay claims are pre-empted only if Mass.Gen.L. ch. 149, § 183 establishes or requires an employer to maintain an employee welfare benefit *plan* within the meaning of ERISA. *See id.* at 6, 107 S.Ct. at 2214.

In *Fort Halifax*, the Supreme Court held that an employee benefit *plan* encompasses only those "benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligations." 482 U.S. at 11, 107 S.Ct. at 2217. Accordingly, the Court found that a Maine statute, which required employers to provide a one-time, lump-sum payment to all employees in the event of a plant relocation or closure, was not pre-empted by ERISA:

> [t]he requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation.

The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well never have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan.

482 U.S. at 12, 107 S.Ct. at 2218. Similarly, following *Fort Halifax*, the Court of Appeals for the Fifth Circuit held that an arrangement offered by General Motors during a mass lay-off in 1983 whereby General Motors employees were given the option of a one-time, lump-sum payment in lieu of retaining any rehire or seniority privileges was not a "plan" under ERISA. *Wells v. General Motors, Corp.*, 881 F.2d 166, 168 (5th Cir.1989), *cert. denied*, 495 U.S. 923, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990).

In the present case, under section 183 of the Massachusetts statute, any eligible employee terminated in the twelve months preceding a transfer of control [5] is entitled to a severance payment equal to twice the employee's weekly compensation multiplied by his completed years of service. Such payment must be made within four pay periods following the change in control. Similarly, eligible employees terminated in the two years following a transfer of control are entitled to severance benefits within one pay period of their termination. An employee is considered eligible for benefits under the statute if he or she has worked for the employer for three or more years and if his or her termination was considered involuntary within the meaning of Mass.Gen.L. ch. 151A, § 25, the Massachusetts Unemployment Compensation Stat-

---

**5.** This time period is actually the shorter of twelve months or the period between the time a new owner gains control of five percent of the company and the final transfer of control. Mass.Gen.L. ch. 149, § 183(c).

ute. Under section 25, an employee's termination is involuntary so long as his or her discharge was not "attributable solely to deliberate misconduct or willful disregard of the employing unit's interest." Mass.Gen.L. ch. 151A, § 25(e).

Like the statute in *Fort Halifax,* section 183 requires one-time, lump sum payments triggered by a contingent event. But section 183 also requires not only that an employer be prepared to monitor terminations over a period of approximately three years and payments over a period of approximately two years, but also that the employer establish and maintain procedures for determining which employees are eligible for payment.

In cases applying *Fort Halifax* to severance pay statutes and programs, the characterization of these payments as a "plan" or merely "benefits" has hinged upon the amount of employer discretion involved in providing payment. In *Pane v. RCA Corp.,* 868 F.2d 631, 635 (3rd Cir.1989), *aff'g* 667 F.Supp. 168 (D.N.J.1987), the Court of Appeals for the Third Circuit affirmed the district court's ruling that a severance plan set up to retain company executives during a merger was a "plan." Fundamental to the lower court's holding was the fact that, under the severance contract at issue, the employee was entitled to benefits only if the employee was terminated for reasons other than for cause. Thus, "the circumstances of each employee's termination [had to] be analyzed in light of [certain] criteria, and an ongoing administrative system constituting an ERISA plan exist[ed]." 667 F.Supp. 168, 171 (D.N.J. 1987).

Similarly, in *Bogue v. Ampex Corp.,* 976 F.2d 1319 (9th Cir.1992), the Court of Appeals for the Ninth Circuit held that a seventeen month "executive parachute" program was a plan, because payment was only provided if the employer were sold and the new owner failed to offer the executive "substantially equivalent employment." Since the program administrator was obligated to determine whether a complaining employee's job was "substantially equivalent" to his preacquisition job, the

program "required a case-by-case, discretionary application of its terms" that constituted an administrative scheme. *See also Akau v. Tel–A–Com Hawaii, Inc.,* 12 EBC 1378, 1382–83, 1990 WL 49818 (D.Ha.1990) (holding that a Hawaii statute authorizing severance pay for terminations due to a closing or relocation was an ERISA plan due to the employer's burden of monitoring the many possible "triggering events" as well as the employees' eligibility).

Significantly, in *Fontenot v. NL Industries, Inc.,* 953 F.2d 960, 961, 963 (5th Cir. 1992), in which the Court of Appeals for the Fifth Circuit held that a "golden parachute" program providing severance pay for executives terminated within two years of a change of control was not a plan under ERISA, the court distinguished *Pane* on the basis that in *Pane,* "the circumstances of each employee's termination had to be analyzed in terms of certain criteria," whereas under the severance plan at issue in *Fontenot,* "employees included in the plan were to receive benefits upon termination regardless of the reason for termination." *Fontenot,* 953 F.2d at 963. Thus, the *Fontenot* court, as did the *Pane, Bogue,* and *Akau* courts, relied on the amount of employer discretion involved in determining whether a "plan" existed.

Applying this well-reasoned logic to the case at hand, section 183 of the Massachusetts statute falls on the *Pane/Bogue* side of the fence. Under section 183, an the employer must determine the eligibility of each employee terminated within an approximately three year period. If the employee is terminated in the two years subsequent to the change in company control, eligibility must be determined and payment made within one period of the employee's termination. If the termination occurred in the twelve months prior to the change in control, payment must be made within four pay periods of the change in control. Clearly, as in *Pane* and *Bogue,* there simply is "no way to carry out this obligation with the unthinking, one-time, nondiscretionary application of the plan administrators in *Fort Halifax* and *Wells.*" *Bogue,* 976 F.2d 1319.

Finally, the fact that Quaker already has its Severance Pay Policy in place, undoubtedly an ERISA plan,[6] underscores rather than weakens the need for pre-emption. In *Fort Halifax*, the Supreme Court stated that whether a State requires an existing plan to pay certain benefits, or whether it requires the *establishment of a separate plan where none existed before*, the problem is the same:

> if [an] employer sought to achieve administrative efficiencies by integrating [a] [particular state-mandated] plan into its existing plan, different components of its single plan would be subject to different requirements. [But] if it established a separate plan to administered the [state-mandated] program, it would lose the benefits of maintaining a single administrative scheme.

482 U.S. at 13, 107 S.Ct. at 2218. Accordingly, since the Maine statute did not "put employers to the choice of either: (1) integrating a state-mandated ongoing benefit plan with an existing plan or (2) establishing a separate plan to process and pay benefits under the plan required by the State," the Maine statute did not fall within the ambit of an "employee benefit *plan.*" 482 U.S. at 14, 107 S.Ct. at 22.

Section 183, however, expressly modifies Quaker's pre-existing Severance Pay Policy with respect to Quaker's Massachusetts employees. Unlike the Maine statute at issue in *Fort Halifax*, which expressly excludes employees covered by an express contract for severance pay, *see* 482 U.S. at 4 n. 1, 5, 107 S.Ct. at 2214 n. 1, 2214, section 183 applies even if a severance plan is already in place.[7] Section 183 thus creates just the type of "patchwork scheme of regulation" that ERISA's pre-emption provision seeks to avoid. *See Fort Halifax*, 482 U.S. at 12, 107 S.Ct. at 2218.

Accordingly, this Court holds that Mass. Gen.L. ch. 149, § 183 is distinguishable from the severance payments at issue in *Fort Halifax* and *Wells*, and does require an administrative scheme. ERISA pre-emption thus applies, and for this reason the claims of Gray and Simas for severance pay pursuant to Mass.Gen.L. ch. 149, § 183 were dismissed.

## VII. CONCLUSION

For the foregoing reasons, Quaker's motions for summary Judgment on the claims of Gray and Simas pursuant to Mass. Gen.L. ch. 149, § 183 were granted and the cross-motions of Gray and Simas were denied. Since Simas asserts no ERISA claims, this Court is without jurisdiction over his wrongful discharge claim and this claim was remanded for further proceedings to the Massachusetts Superior Court sitting in and for the County of Bristol.

---

**6.** Quaker's Severance Pay Policy clearly meets the requirements of an ongoing administrative plan. *See* Severance Pay Policy, attached as Exhibit A to Affidavit of Eva Custadio (offered in support of Quaker's Motion to Dismiss).

**7.** Section 183 excludes only those employees whose severance plans "provide for ... payment ... *in excess* of that provided by [section 183]." Mass.Gen.L. ch. 149, § 183(d)(1) (emphasis added).