No. 93-488
IN THE SUPREME COURT OF THE STATE OF MONTANA
1994

PAUL CASAROTTO and PAMELA CASAROTTO,

      Plaintiffs and Appellants,

  v.

NICK LOMBARDI and DOCTOR'S ASSOCIATES, INC.,

      Defendants and Respondents,

  and

DANIEL L. and DEB HUDSON, and D&D SUBWAY CORPORATION,

      Defendants.

APPEAL FROM:   District Court of the Eighth Judicial District,
             In and for the County of Cascade,
             The Honorable John M. McCarvel, Judge presiding.

COUNSEL OF RECORD:

      For Appellants:

          Grant D. Parker (argued) and Philip D. Tawney,
          Mullendore, Tawney & Watt, Missoula, Montana

      For Respondents:

          Alan G. Schwartz (argued) and Ian E. Bjorkman,
          Wiggin & Dana, New Haven, Connecticut

          L. D. Nybo, Conklin, Nybo, LeVeque
          & Murphy, Great Falls, Montana

      For Amici Curiae:

          Lawrence A. Anderson, Attorney at Law, Great Falls,
          Montana (Montana Trial Lawyers Ass'n)

          Michael A. Bowen and Michael G. McCarty,
          Foley & Lardner, Milwaukee, Wisconsin
          (International Franchise Ass'n; Securities
          Industry Ass'n; Snap-On Tools Corp.)

# FILED

DEC 15 1994

Filed: _Ed Smith_
  CLERK OF SUPREME COURT
   STATE OF MONTANA



Clerk

Submitted:  April 19, 1994
Decided:   December 15, 1994

Justice Terry N. Trieweiler delivered the opinion of the Court.

Plaintiffs Paul and Pamela Casarotto filed this suit in the District Court for the Eighth Judicial District in Cascade County to recover damages which they claim were caused by the defendants' breach of contract and tortious conduct. Defendants Nick Lombardi and Doctor's Associates, Inc. (DAI), moved the District Court for an order dismissing plaintiffs' complaint, or in the alternative, staying further judicial proceedings pending arbitration of plaintiffs' claims pursuant to a provision in DAI's franchise agreement with plaintiffs which required that disputes "arising out of or relating to" that contract be settled by arbitration. The District Court granted defendants' motion, and ordered that further judicial proceedings be stayed until arbitration proceedings were completed in accordance with the terms of the parties' agreement. Plaintiffs appeal from that order. We reverse the order of the District Court.

The issues raised on appeal are:

1. Based on conflict of law principles, is the franchise agreement entered into between the Casarottos and DAI governed by Connecticut law or Montana law?

2. If the contract is governed by Montana law, is the notice requirement in § 27-5-114(4), MCA, of Montana's Uniform Arbitration Act, preempted by the Federal Arbitration Act found at 9 U.S.C. §§ 1-15 (1988)?

## FACTUAL BACKGROUND

On October 29, 1992, Paul and Pamela Casarotto filed an amended complaint naming Doctor's Associates, Inc., and Nick

2

Lombardi as defendants. For purposes of our review of the District Court's order, we presume the facts alleged in the complaint to be true.

DAI is a Connecticut corporation which owns Subway Sandwich Shop franchises, and Lombardi is their development agent in Montana. The Casarottos entered into a franchise agreement with DAI which allowed them to open a Subway Sandwich Shop in Great Falls, Montana. However, they were told by Lombardi that their first choice for a location in Great Falls was unavailable.

According to their complaint, the Casarottos agreed to open a shop at a less desirable location, based on a verbal agreement with Lombardi that when their preferred location became available, they would have the exclusive right to open a store at that location. Contrary to that agreement, the preferred location was subsequently awarded by Lombardi and DAI to another franchisee. As a result, the Casarottos' business suffered irreparably, and they lost their business, along with the collateral which secured their SBA loan.

This action is based on the Casarottos' allegation that Lombardi and DAI breached their agreement with the Casarottos, defrauded them, breached the covenant of good faith and fair dealing, and engaged in other tortious conduct, all of which directly caused the Casarottos loss of business and the resulting damage.

DAI's franchise agreement with the Casarottos was executed on April 25, 1988. There was no indication on the first page of the contract that it was subject to arbitration. However,

3

paragraph 10(c) of the contract, found on page 9, included the following provision:

> Any controversy or claim arising out of or relating to this contract or the breach thereof shall be settled by Arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association at a hearing to be held in Bridgeport, Connecticut and judgment upon an award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereof. The commencement of arbitration proceedings by an aggrieved party to settle disputes arising out of or relating to this contract is a condition precedent to the commencement of legal action by either party. The cost of such a proceeding will be born equally by the parties.

On January 29, 1993, DAI moved the District Court to dismiss the Casarottos' complaint, or at least stay further judicial proceedings, pending arbitration pursuant to paragraph 10(c) of the franchise agreement. DAI alleged that the franchise agreement affected interstate commerce, and therefore, was subject to the Federal Arbitration Act found at 9 U.S.C. §§ 1-15 (1988). They sought a stay of proceedings pursuant to § 3 of that Act, which provides in relevant part that:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . .

DAI claimed that Montana law could not be raised as a bar to enforcement of the arbitration provision for two reasons: First, the contract specifically called for the application of Connecticut

4

law; and second, Montana law was preempted by the Federal Arbitration Act.

The Casarottos opposed DAI's motion on the grounds that Montana law applied, in spite of the choice of law provision in the contract, and that based on § 27-5-114(4), MCA, the contract's arbitration provision was unenforceable because DAI had not provided notice on the first page of the agreement that the contract was subject to arbitration.

On June 2, 1993, the District Court issued its order granting DAI's motion to stay further judicial proceedings pursuant to 9 U.S.C. § 3. The order was made applicable to both DAI and Lombardi, but not to other named defendants who were not parties to the franchise agreement and whose alleged conduct raises other issues. On July 8, 1993, the District Court issued an order pursuant to Rule 54(b), M.R.Civ.P., certifying its June 2 order as final for purposes of appeal. The Casarottos appeal from that order.

## ISSUE 1

Based on conflict of law principles, is the franchise agreement entered into between the Casarottos and DAI governed by Connecticut law or Montana law?

Paragraph 12 of the franchise agreement entered into between the parties provides as follows: "This agreement shall be governed by and construed in accordance with the laws of the State of Connecticut and contains the entire understanding of the parties." DAI contends that, therefore, Connecticut law governs our

5

interpretation of the contract and that since Connecticut law is identical to the Federal Arbitration Act *see* Conn. Gen. Stat. § 52-409 (1993), conspicuous notice that the contract was subject to arbitration was not required and we need not concern ourselves with the issue of whether Montana law is preempted.

The Casarottos respond that the issue of whether to apply Connecticut or Montana law involves a conflict of law issue and that the answer can be found in our prior decisions. We agree.

In *Emerson v. Boyd* (1991), 247 Mont. 241, 805 P.2d 587, we cited with approval the Ninth Circuit's decision in *R. J. Williams Co. v. Fort Belknap Housing Authority* (9th Cir. 1983), 719 F.2d 979, which adopted the criteria established in Restatement (Second) of Conflict of Laws § 188 (1971) to determine which jurisdiction's laws apply to a contract where no choice of law is provided for in the contract. Section 188 provides as follows:

> (1) The rights and duties of the parties with respect to an issue in contract are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in § 6.
>
> (2) In the absence of an effective choice of law by the parties (see § 187), the context to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
>
>> (a) the place of contracting,
>>
>> (b) the place of negotiation of the contract,
>>
>> (c) the place of performance,
>>
>> (d) the location of the subject matter of the contract, and

6

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contracts are to be evaluated according to their relative importance with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied, except as otherwise provided in §§ 189-199 and 203.

In this case, there is a choice of law provision in the parties' contract. The question is whether it was an "effective" choice. We recently held in *Youngblood v. American States Ins. Co.* (1993), 262 Mont. 391, 394, 866 P.2d 203, 205, that this State's public policy will ultimately determine whether choice of law provisions in contracts are "effective." In that case, we stated:

> Here, the general policy language in the insurance contract requires American States to pay whatever damages are required in Montana; that is, the contract is to be performed in Montana. Therefore, unless a contract term provides otherwise, *Kemp [v. Allstate Ins. Co. (1979), 183 Mont. 526, 601 P.2d 20]* and § 28-3-102, MCA, require the application of Montana law because the contract was to be 'performed' in Montana. In this case, however, the insurance contract contains a choice of law provision which requires the application of Oregon subrogation law. . . .
>
> . . . .
>
> . . . [T]he choice of law provision will be enforced unless enforcement of the contract provision requiring application of Oregon law as regards subrogation of medical payments violates Montana's public policy or is against good morals.

*Youngblood*, 866 P.2d at 205.

Based on our conclusion in that case that subrogation of medical payment benefits was contrary to our public policy, we held that:

7

[T]he choice of law provision in the insurance contract would result in medical payment subrogation under Oregon law. Because such subrogation violates Montana's public policy, that term of the insurance contract at issue here is not enforceable.

*Youngblood*, 866 P.2d at 208.

Restatement (Second) of Conflict of Laws § 187(2) (1971) is consistent with our decision in *Youngblood*, and expands upon the factors to be considered under the circumstances in this case. It provides that:

(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Adopting § 187, then, as our guide, we first look to § 188 to determine whether Montana law would be applicable absent an "effective" choice of law by the parties.

According to the affidavit of Paul Casarotto filed in opposition to DAI's motion to dismiss, he executed the contract in neither Connecticut nor Montana. It was executed while he was traveling in New York. However, it appears from that same

8

affidavit, and from the allegations in the complaint, that original negotiations were conducted by him in Great Falls, the contract was to be performed in Great Falls, the subject matter of the contract (the Subway Sandwich Shop) was located in Great Falls, and that he and Pamela Casarotto resided in Great Falls at the time that the contract was executed. The only connection to Connecticut was that DAI was incorporated in that state and apparently had its home office in that state at the time of the parties' agreement. We conclude that based upon the application of the criteria set forth in § 188, and our prior decision in *Emerson*, Montana has a materially greater interest than Connecticut in the contract issue that is presented, and that absent an "effective" choice of law by the parties, Montana law would apply.

Our remaining inquiry, then, is whether application of Connecticut law would be contrary to a fundamental policy of this State by eliminating the requirement that notice be provided when a contract is subject to arbitration.

In *Trammel v. Brotherhood of Locomotive Firemen and Enginemen* (1953), 126 Mont. 400, 409, 253 P.2d 329, 334, we held that the public policy of a state is established by its express legislative enactments. Here, the legislative history for § 27-5-114(4), MCA, makes clear that the legislative committee members considering adoption of the Uniform Arbitration Act had two primary concerns. First, they did not want Montanans to waive their constitutional right of access to Montana's courts unknowingly, and second, they were concerned about

9

Montanans being compelled to arbitrate disputes at distant locations beyond the borders of our State.

The facts in this case, and our recent decision in another case, justify those concerns.

Regardless of the amount in controversy between these parties, the arbitration clause in the Subway Sandwich Shop Franchise Agreement requires that the Casarottos travel thousands of miles to Connecticut to have their dispute arbitrated. Furthermore, it requires that they share equally in the expense of arbitration, regardless of the merits of their claim. Presumably, that expense could be substantial, since under the Commercial Arbitration Rules of the American Arbitration Association (1992), those expenses would, at a minimum, include: the arbitrator's fees and travel expenses, the cost of witnesses chosen by the arbitrator, the American Arbitration Association's administrative charges, and a filing fee of up to $4000, depending on the amount in controversy. For a proceeding involving multiple arbitrators, the administrative fee alone, for which the Casarottos would be responsible, is $150 a day. In addition, since the contract called for the application of Connecticut law, the Casarottos would be required to retain the services of a Connecticut attorney.

In spite of the expense set forth above, the procedural safeguards which have been established in Montana to assure the reliability of the outcome in dispute resolutions are absent in an arbitration proceeding. The extent of pretrial discovery is within the sole discretion of the arbitrator and the rules of evidence are

10

not applicable. The arbitrator does not have to follow any law, and there does not have to be a factual basis for the arbitrator's decision. *See May v. First National Pawn Brokers, Ltd.* (Mont. Dec. 15 , 1994), Slip Op. 94-189.

Based upon the determination by the Legislature of this State that the citizens of this State are at least entitled to notice before entering into an agreement which will limit their future resolution of disputes to a procedure as potentially inconvenient, expensive, and devoid of procedural safeguards as the one provided for by the rules of the American Arbitration Association, and the terms of this contract, we conclude that the notice requirement of § 27-5-114, MCA, does establish a fundamental public policy in Montana, and that the application of Connecticut law would be contrary to that policy. Therefore, we conclude that the law of Montana governs the franchise agreement entered into between the Casarottos and Doctor's Associates, Inc.

## ISSUE 2

If the contract is governed by Montana law, is the notice requirement in § 27-5-114(4), MCA, of Montana's Uniform Arbitration Act, preempted by the Federal Arbitration Act found at 9 U.S.C. §§ 1-15 (1988)?

DAI contends that even if Montana law is applicable, § 27-5-114(4), MCA, is preempted by the Federal Arbitration Act because it would void an otherwise enforceable arbitration agreement. In support of its argument, DAI relies on U.S. Supreme

11

Court decisions in *Perry v. Thomas* (1987), 482 U.S. 483, 107 S. Ct. 2520, 96 L. Ed. 2d 426, *Southland Corp. v. Keating* (1984), 465 U.S. 1, 104 S. Ct. 852, 79 L. Ed. 2d 1, and *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.* (1983), 460 U.S. 1, 103 S. Ct. 927, 74 L. Ed. 2d 765. These cases have been referred to as "[a] trilogy of United States Supreme Court cases" which "developed the federal policy favoring arbitration and the principle that the FAA is substantive law enacted pursuant to Congress's commerce powers that preempts contrary state provisions." David P. Pierce, *The Federal Arbitration Act: Conflicting Interpretations of its Scope* 61 Cinn. L. Rev. 623, 630 (1992). From this trilogy, *Southland* and *Perry* appear to be closest on point and warrant some discussion.

Southland Corporation was the owner and franchisor of 7-Eleven Convenience Stores. Its standard franchise agreements, like DAI's included an arbitration provision. Southland was sued in California by several of its franchisees, based on claims which included violations of the disclosure requirements of the California Franchise Investment Law, Cal. Corp. Code § 31000, et seq. (West 1977). The California Supreme Court held that the Franchise Investment Law required judicial consideration of claims brought under that statute, and therefore, held that arbitration could not be compelled. The U.S. Supreme Court disagreed, and held that:

> In creating a substantive rule applicable in state as well federal courts, Congress intended to foreclose state legislative attempts to undercut the enforceability

12

of arbitration agreements. We hold that §31512 of the California Franchise Investment Law violates the Supremacy Clause.

*Southland*, 465 U.S. at 16 (footnotes omitted).

In *Perry*, the Supreme Court was called upon to reconcile 9 U.S.C. § 2 which mandates enforcement of arbitration agreements, with § 229 of the California Labor Code, "which provides that actions for the collection of wages may be maintained 'without regard to the existence of any private agreement to arbitrate.'" *Perry*, 465 U.S. at 484 (quoting Cal. Lab. Code § 229 (West 1971)). In that case, Kenneth Thomas sued his former employer for commissions he claimed were due for the sale of securities. His employer sought to stay the proceedings pursuant to §§ 2 and 4 of the Federal Arbitration Act, based on the arbitration provision found in Thomas's application for employment. *Perry*, 465 U.S. at 484-85. In an opinion affirmed by the California Court of Appeals and the California Supreme Court, the California Superior Court denied the motion to compel arbitration. On appeal, the U.S. Supreme Court held that § 2 of the FAA reflected a strong national policy favoring arbitration agreements, notwithstanding "state substantive or procedural policies to the contrary." *Perry*, 482 U.S. at 489. Citing its decision in *Southland*, the Court held that:

> "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." Id. at 16 (footnote omitted). Section 2, therefore, embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce or is revocable "upon such grounds as exist at law or in equity

13

> for the revocation of any contract." 9 U.S.C. § 2. "We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under state law." *Keating, supra*, at 11.

*Perry*, 482 U.S. at 489-90.

As additional authority, DAI cites to our own previous decisions which have enforced arbitration agreements in Montana based on *Southland* and *Perry*. *See Downey v. Christensen* (1992), 251 Mont. 386, 825 P.2d 557; *Vukasin v. D.A. Davidson & Co.* (1990), 241 Mont. 126, 785 P.2d 713; *William Gibson, Jr., Inc. v. James Graff Communications* (1989), 239 Mont. 335, 780 P.2d 1131; *Larsen v. Opie* (1989), 237 Mont. 108, 771 P.2d 977; *Passage v. Prudential-Bache Securities, Inc.* (1986), 223 Mont. 60, 727 P.2d 1298.

The Casarottos, however, contend that *Southland* and *Perry* must be considered in light of the Supreme Court's more recent decision in *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University* (1989), 489 U.S. 468, 109 S. Ct. 1248, 103 L. Ed. 2d 488, and that our prior arbitration decisions did not deal with the enforceability of arbitration agreements which violated Montana's statutory law. We agree.

In *Volt*, the parties entered into a construction contract which contained an agreement to arbitrate all disputes between the parties relating to the contract. The contract also provided that it would be governed by the law in the state where the project was located. *Volt*, 489 U.S. at 470.

14

As a result of a contract dispute between the parties, Stanford filed an action in California Superior Court naming Volt and two other companies involved in the construction project. Volt petitioned the Superior Court to compel arbitration of the dispute. However, the California Arbitration Act found at Cal. Civ. Proc. Code § 1280, et seq. (West 1982), contained a provision allowing the court to stay arbitration pending resolution of related litigation. On that basis, the Superior Court denied Volt's motion to compel arbitration, and instead, stayed arbitration proceedings pending outcome of the litigation. The California Court of Appeals affirmed that decision, and the California Supreme Court denied Volt's petition for discretionary review. The U.S. Supreme Court granted review and affirmed the decision of the California courts. *Volt*, 489 U.S. at 471-73.

On appeal, the Supreme Court considered Volt's argument that California's arbitration laws were preempted by the Federal Arbitration Act. In its analysis of the preemption issue, the Supreme Court stated that:

> The FAA contains no express pre-emptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. But even when Congress has not completely displaced state regulation in an area, state law may nonetheless be pre-empted to the extent that it actually conflicts with federal law--that is, to the extent that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The question before us, therefore, is whether application of Cal.Civ.Proc. Code Ann. § 1281.2(c) to stay arbitration under this contract in interstate commerce, in accordance with the terms of the arbitration

15

> agreement itself, would undermine the goals and policies
> of the FAA.  We conclude that it would not.

*Volt*, 489 U.S. at 477-78 (citation omitted; emphasis added).

The Supreme Court explained that the purpose of the Federal Arbitration Act was to enforce lawful agreements entered into by the parties, and not to impose arbitration on the parties involuntarily.  It noted that in this case the parties' agreement was to be bound by the arbitration rules from California. Therefore, it held that:

> Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward.  By permitting the courts to "rigorously enforce" such agreements according to their terms, see *[Dean Witter Reynolds, Inc. v. ]Byrd*, [470 U.S.] at 221, we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind the FAA.

*Volt*, 489 U.S. at 479.

While the Court in *Volt* applied state laws that had been chosen by the parties in their contract, and this case involves state law which is applied pursuant to conflict of law principles, it has been observed that:

> The real significance of the *Volt* decision is not in the Court's holding, but rather in what the Court failed to hold.  For example, the Court found no preemption of the California arbitration law by the FAA.  Instead, the Court merely stated that Congress did not intend that the FAA occupy the entire field of arbitration law.  Thus, enforcing the California law was merely a procedural issue and did not frustrate the policy behind the FAA of enforcing the agreement.

16

David P. Pierce, *The Federal Arbitration Act: Conflicting Interpretations of its Scope*

61 Cinn. L. Rev. 623, 635 (1992) (footnotes omitted).

Section 2 of 9 U.S.C. provides that:

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, <u>save upon such grounds as exist at law or in equity for the revocation of any contract.</u>

(Emphasis added.)

Based upon the Supreme Court's decision in *Volt*, we conclude that the nature of our inquiry is whether Montana's notice requirement found at § 27-5-114(4), MCA, would "undermine the goals and policies of the FAA." We conclude that it does not.

DAI relies on decisions in *Threlkeld & Co., Inc. v. Metallgesellschaft Ltd.* (2d Cir. 1991), 923 F.2d 245, *Securities Industry Ass'n v. Connolly* (1st Cir. 1989), 883 F.2d 1114, *Webb v. R. Rowland & Co., Inc.* (8th Cir. 1986), 800 F.2d 803, and *Bunge Corp. v. Perryville Feed & Produce, Inc.* (Mo. 1985), 685 S.W.2d 837, in support of its argument that notice provisions are preempted by federal law.

The Casarottos, on the other hand, rely on decisions in *American Physicians v. Port Lavaca Clinic* (Tex. Ct. App. 1992), 843 S.W.2d 675, and *Albright v. Edward D. Jones & Co.* (Ind. Ct. App. 1991), 571 N.E.2d 1329, for the principle that since *Volt*, other courts have held that

17

notice provisions in state arbitration laws are not preempted by the Federal Arbitration Act.

However, the cases cited by the parties either precede the Supreme Court's decision in *Volt*, or contain little or no reference to the *Volt* decision. We conclude that none are persuasive, and we must rely on our own analysis of whether Montana's notice requirement undermines the goals and policies of the FAA.

Our conclusion that Montana's notice requirement does not undermine the policies of the FAA is based on the Supreme Court's conclusion that it was never Congress's intent when it enacted the FAA to preempt the entire field of arbitration, and its further conclusion that the FAA does not require parties to arbitrate when they have not agreed to do so. That Court held that the purpose of the FAA is simply to enforce arbitration agreements into which parties had entered, and acknowledged that the interpretation of contracts is ordinarily a question of state law. *Volt*, 489 U.S. at 474.

Presumably, therefore, the Supreme Court would not find it a threat to the policies of the Federal Arbitration Act for a state to require that before arbitration agreements are enforceable, they be entered knowingly. To hold otherwise would be to infer that arbitration is so onerous as a means of dispute resolution that it can only be foisted upon the uninformed. That would be inconsistent with the conclusion that the parties to the contract are free to decide how their disputes should be resolved.

18

Montana's notice requirement does not preclude parties from knowingly entering into arbitration agreements, nor do our courts decline to enforce arbitration agreements which are entered into knowingly.

Therefore, we conclude that Montana's notice statute found at § 27-5-114(4), MCA, would not undermine the goals and policies of the FAA, and is not preempted by 9 U.S.C. § 2 (1988).

Because the agreement of the parties in this case did not comply with Montana's statutory notice requirement, it is not subject to arbitration, according to the law of Montana. The District Court's order dated June 2, 1993, is, therefore, reversed, and this case is remanded to the District Court for further proceedings consistent with this opinion.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

19

Justice Terry N. Trieweiler specially concurring.

The majority opinion sets forth principles of law agreeable to the majority of this Court in language appropriate for judicial precedent. I offer this special concurring opinion as my personal observation regarding many of the federal decisions which have been cited to us as authority.

To those federal judges who consider forced arbitration as the panacea for their "heavy case loads" and who consider the reluctance of state courts to buy into the arbitration program as a sign of intellectual inadequacy, I would like to explain a few things.

In Montana, we are reasonably civilized and have a sophisticated system of justice which has evolved over time and which we continue to develop for the primary purpose of assuring fairness to those people who are subject to its authority.

Over the previous 100 years of our history as a state, our courts have developed rules of evidence for the purpose of assuring that disputes are resolved on the most reliable bases possible.

Based on the presumption that all men and women are fallible and make mistakes, we have developed standards for appellate review which protect litigants from human error or the potential arbitrariness of any one individual.

We believe in the rule of law so that people can plan their commercial and personal affairs. If our trial courts decline to follow those laws, our citizens are assured that this Court will enforce them.

20

We have rules for venue, and jurisdictional requirements based on the assumption that it is unfair to force people to travel long distances from their homes at great expense and inconvenience to prosecute or defend against lawsuits.

We believe that our courts should be accessible to all, regardless of their economic status, or their social importance, and therefore, provide courts at public expense and guarantee access to everyone.

We have developed liberal rules of discovery (patterned after the federal courts) based on the assumption that the open and candid exchange of information is the surest way to resolve claims on their merits and avoid unnecessary trials.

We have contract laws and tort laws. We have laws to protect our citizens from bad faith, fraud, unfair business practices, and oppression by the many large national corporations who control many aspects of their lives but with whom they have no bargaining power.

While our system of justice and our rules are imperfect, they have as their ultimate purpose one overriding principle. They are intended, and continue to evolve, for the purpose of providing fairness to people, regardless of their wealth or political influence.

What I would like the people in the federal judiciary, especially at the appellate level, to understand is that due to their misinterpretation of congressional intent when it enacted the Federal Arbitration Act, and due to their naive assumption that arbitration provisions and choice of law provisions are knowingly

21

bargained for, all of these procedural safeguards and substantive laws are easily avoided by any party with enough leverage to stick a choice of law and an arbitration provision in its pre-printed contract and require the party with inferior bargaining power to sign it.

The procedures we have established, and the laws we have enacted, are either inapplicable or unenforceable in the process we refer to as arbitration.

I am particularly offended by the attitude of federal judges, typified by the remarks of Judge Selya in the First Circuit, which were articulated in *Securities Industry Ass'n v. Connolly* (1st Cir. 1989), 883 F.2d 1114, *cert. denied* (1990), 495 U.S. 956, 110 S. Ct. 2559, 109 L. Ed. 2d 742.

Judge Selya considered "[i]ncreased resort to the courts" as the cause for "tumefaction of already-swollen court calendars." He refers to arbitration as "a contractual device that relieves some of the organic pressure by operating as a shunt, allowing parties to resolve disputes outside of the legal system." *Connolly*, 883 F.2d at 1116. He states that "[t]he hope has long been that the Act could serve as a therapy for the ailment of the crowded docket." *Connolly*, 883 F.2d at 1116. He then bemoans that fact that, "[a]s might be expected, there is a rub: the patient, and others in interest, often resist the treatment." *Connolly*, 883 F.2d at 1116.

Judge Selya refers to the preference in the various state jurisdictions to resolve disputes according to traditional notions

22

of fairness, and then suggests that "[t]he FAA was enacted to overcome this 'anachronism'." *Connolly*, 883 F.2d at 1119 (citation omitted). He considers it the role of federal courts to be "on guard for artifices in which the ancient suspicion of arbitration might reappear." *Connolly*, 883 F.2d at 1119.

This type of arrogance not only reflects an intellectual detachment from reality, but a self-serving disregard for the purposes for which courts exist.

With all due respect, Judge Selya's opinion illustrates an all too frequent preoccupation on the part of federal judges with their own case load and a total lack of consideration for the rights of individuals. Nowhere in Judge Selya's lengthy opinion is there any consideration for the total lack of procedural safeguards inherent in the arbitration process. Nowhere in his opinion does he consider the financial hardship that contracts, like the one in this case, impose on people who simply cannot afford to enforce their rights by the process that has been forced upon them. Nowhere does Judge Selya acknowledge that the "patient" (presumably courts like this one) who resists the "treatment" (presumably the imposition of arbitration in lieu of justice) has a case load typically three times as great as Justice Selya's case load.

The notion by federal judges, like Judge Selya, that people like the Casarottos have knowingly and voluntarily bargained and agreed to resolve their contractual disputes or tort claims by arbitration, is naive at best, and self-serving and cynical at

23

worst. To me, the idea of a contract or agreement suggests mutuality. There is no mutuality in a franchise agreement, a securities brokerage agreement, or in any other of the agreements which typically impose arbitration as the means for resolving disputes. National franchisors, like the defendant in this case, and brokerage firms, who have been the defendants in many other arbitration cases, present form contracts to franchisees and consumers in which choice of law provisions and arbitration provisions are not negotiable, and the consequences of which are not explained. The provision is either accepted, or the business or investment opportunity is denied. Yet these provisions, which are not only approved of, but encouraged by people like Judge Selya, do, in effect, subvert our system of justice as we have come to know it. If any foreign government tried to do the same, we would surely consider it a serious act of aggression.

Furthermore, if the Federal Arbitration Act is to be interpreted as broadly as some of the decisions from our federal courts would suggest, then it presents a serious issue regarding separation of powers. What these interpretations do, in effect, is permit a few major corporations to draft contracts regarding their relationship with others that immunizes them from accountability under the laws of the states where they do business, and by the courts in those states. With a legislative act, the Congress, according to some federal decisions, has written state and federal courts out of business as far as these corporations are concerned. They are not subject to California's labor laws or franchise laws,

24

they are not subject to our contract laws or tort laws. They are, in effect, above the law.

These insidious erosions of state authority and the judicial process threaten to undermine the rule of law as we know it.

Nothing in our jurisprudence appears more intellectually detached from reality and arrogant than the lament of federal judges who see this system of imposed arbitration as "therapy for their crowded dockets." These decisions have perverted the purpose of the FAA from one to accomplish judicial neutrality, to one of open hostility to any legislative effort to assure that unsophisticated parties to contracts of adhesion at least understand the rights they are giving up.

It seems to me that judges who have let their concern for their own crowded docket overcome their concern for the rights they are entrusted with should step aside and let someone else assume their burdens. The last I checked, there were plenty of capable people willing to do so.

_____
Justice

Justice Fred J. Weber dissents as follows:

I respect the majority opinion in its expression of the deeply held conviction that arbitration of the type expressed in the contract in this case should not be enforced in Montana and thereby deprive the parties of access to the court system. The answer to such a judicial approach was stated by the United States Supreme Court in Volt Info. Sciences v. Bd. of Trustees (1989), 489 U.S. 468, 478, 109 S.Ct. 1248, 1255, 103 L.Ed.2d 488, 497, in which the United States Supreme Court stated:

> The Act [Federal Arbitration Act] was designed "to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate," . . . and place such agreements "upon the same footing as other contracts," . . . Section 2 of the Act therefore declares that a written agreement to arbitrate in any contract involving interstate commerce or a maritime transaction "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (Citations omitted.)

I specifically disagree with the majority opinion's refusal to enforce the agreement to arbitrate in the present case.

### Issue I

As stated in the majority opinion: Based on conflict of law principles, is the franchise agreement entered into between the Casarottos and DAI governed by Connecticut law or Montana law?

I point out that the issue as stated by the parties essentially was whether an out-of-state corporation can avoid Montana Arbitration Act's conspicuous notice requirement by claiming preemption under the FAA?

The majority opinion refers to this Court's 1991 case of Emerson v. Boyd. In determining whether a contract dispute arose

26

on an Indian reservation, that case adopted language from <u>R.J.</u> <u>Williams Co.</u>, a Ninth Circuit case with regard to the factors to be used to determine whether an action did arise on the reservation. In contrast to the present case, <u>Emerson v. Boyd</u> did not contain an agreed choice of law as is present in this case. I do not find this to be appropriate authority.

The majority opinion on this issue concludes that the Montana Legislature had determined that its citizens are entitled to notice before entering into an agreement which will limit their future resolution of disputes to a procedure inconvenient, expensive and devoid of procedural safeguards--and further concludes that the notice requirements of § 27-5-114, MCA, established a fundamental public policy in this State which is contrary to the policy of the Connecticut law. On the basis of those conclusions, the majority opinion further concludes that the law of Montana governs. I do not agree with that conclusion.

The key parts of § 27-5-114, MCA, which apply to this issue are the following:

> **Validity of arbitration agreement--exceptions.** (1) A written agreement to submit an existing controversy to arbitration is valid and enforceable except upon such grounds as exist at law or in equity for the revocation of a contract.
> . . .
> (4) Notice that a contract is <u>subject to arbitration</u> <u>pursuant to this chapter shall be typed in underlined</u> <u>capital letters on the first page</u> of the contract; and unless such notice is displayed thereon, the contract may not be subject to arbitration. (Emphasis supplied.)

Our question then becomes whether the contract here is subject to "arbitration pursuant to this chapter" so that the notice must be

typed in underlined capital letters on the first page of the contract. Two specific paragraphs of the contract are controlling here. Section 10(c) of the contract stated in pertinent part:

> Any controversy or claim arising out of or relating to this contract or the breach thereof shall be settled by Arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association at a hearing to be held in Bridgeport, Connecticut, . . .

Section 12 of the agreement further stated:

> 12. This Agreement shall be governed by and construed in accordance with the laws of the State of Connecticut and contains the entire understanding of the parties. Other than the representations contained in the Agreement, the Offering Circular and advertising materials of the Franchisor, no other representations have been made to or relied upon by the Franchisee except as set forth below: (None are set forth)

When the foregoing contract provisions are compared to subsection (4) of § 27-5-114, MCA, it is apparent that these contract provisions do not fit within the statute. There is no statement in the Franchise Agreement which specifies that the contract is subject to arbitration pursuant to Montana law or to the Uniform Arbitration Act as enacted in Montana under §§ 27-5-111 to 115, MCA.

I conclude that the contract provisions are controlling in this instance and that the contract between the parties is not by its terms subject to Montana law or arbitration under Montana law. In fact the reverse is true. As above specified, the agreement requires that the commercial rules of the American Arbitration Association shall be applied in any arbitration, and also provides that the agreement is governed by and construed under the laws of the State of Connecticut. This clearly rebuts any suggestion that

**28**

this particular contract is subject to arbitration pursuant to the laws of the State of Montana and in particular § 27-5-114, MCA. I therefore conclude that the notice requirement of § 27-5-114, MCA, does not in any way establish a fundamental public policy which is applicable to the present contract.

I further point out that the reference to Restatement (Second) of Conflict of Laws, § 188 (1971), is applicable only in the absence of an "effective" choice of law and I conclude there was such an effective choice of law in the present case.

Issue II

If the contract is governed by Montana law, is the notice requirement of § 27-5-114(4), MCA, of Montana's Uniform Arbitration Act, preempted by the Federal Arbitration Act found at 9 U.S.C. § 1-15 (1988)?

The majority opinion quotes the following from the 1987 United States Supreme Court opinion of Perry v. Thomas:

> . . . Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements. . . . Section 2, therefore, embodies a clear federal policy of requiring arbitration unless the agreement to arbitrate is not part of a contract evidencing interstate commerce . . . We see nothing in the Act indicating that the broad principle of enforceability is subject to any additional limitations under state law. . . . (Emphasis supplied.)

The affidavit of the vice president of DAI establishes without contradiction that the present agreement to arbitrate is part of a contract in interstate commerce:

> 5. Before July 1991, DAI was a corporation organized under the laws of the State of Connecticut, with a principal place of business at 325 Bic Drive, Milford, CT 06460. On July 1, 1991, DAI of Florida

29

merged with DAI of Connecticut, leaving DAI of Florida as a surviving corporation.

6. DAI has sold a total of 8500 Subway franchises in the United States and estimates that there are approximately 7400 stores in operation world wide.

Clearly the present agreement to arbitrate is part of a contract evidencing interstate commerce so the Federal Arbitration Act is applicable.

The majority opinion analyzes the United States Supreme Court's decision in Volt and from that concludes that the nature of the inquiry is whether Montana's notice requirement under § 27-5-114(4), MCA, would undermine the goals and policy of the FAA and further concludes it does not. I disagree with that analysis of Volt.

In Volt, Volt petitioned the California court to compel arbitration of a dispute and the defendant moved to stay arbitration pursuant to California law. The California statute permitted the court to stay arbitration pending resolution of related litigation between a party to the arbitration agreement and third parties not bound by it. The California court stayed the arbitration proceedings pending the outcome of the litigation. In considering whether the California code section in question was preempted by the FAA, the United States Supreme Court stated:

The FAA contains no express preemptive provision, nor does it reflect a congressional intent to occupy the entire field of arbitration. . . . But even when congress has not completely displaced state regulation in an area, state law may nonetheless be preempted to the extent that it actually conflicts with federal law--that is, to the extent that it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." . . .The question before us, therefore, is whether application of Cal. Civ. Proc. Cod.

30

Ann. § 1281.2(c) to stay arbitration under this contract in interstate commerce, in accordance with the terms of the arbitration agreement itself, would undermine the goals and policies of the FAA. We conclude it would not.

. . .

. . . Accordingly, we have recognized that the FAA does not require parties to arbitrate when they have not agreed to do so. See id., at 219, 84 L.Ed.2d 158, 105 S.Ct. 1238. (The Act "does not mandate the arbitration of all claims"), nor does it prevent parties who do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement. <u>It simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts</u>, <u>in accordance with their terms</u>. . . (Citations omitted.) (Emphasis supplied.)

Volt, 489 U.S. at 477-78, 109 S.Ct. at 1255, 103 L.Ed.2d at 499-

500. The court further stated and concluded:

Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit . . . Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward.

Volt, 489 U.S. at 479, 109 S.Ct. at 1256, 103 L.Ed. at 500. It is essential to keep in mind that the key holding of Volt as expressed by the United State Supreme Court was that the agreement to arbitrate should be enforced according to its terms--and that allowed application of the California law which provided for the stay in proceedings where other parties besides the arbitration parties were involved in the case. That conclusion does not assist the majority opinion. The rationale of the Volt decision in the present case would require enforcement of the contract as agreed upon by the parties--which would require application of the American Arbitration Association rules as well as the laws of the

31

State of Connecticut. I conclude that the contract here should be enforced to require application of the American Arbitration Association Rules and the laws of the State of Connecticut under <u>Volt</u>.

In addition to the conclusion reached under <u>Volt</u>, I will discuss several cases which have concluded that a statutory provision similar to Montana's statutory requirement of a statement in capital letters on page one of a contract is in conflict with the Federal Arbitration Act and therefore not enforceable. In David L. Threlkeld and Co. v. Metallgesellschaft Ltd. (2nd Cir. 1991), 923 F.2d 245, Threlkeld asserted that Vermont law voided any arbitration agreement which does not have a specific acknowledgement of arbitration signed by both parties and where the agreement to arbitrate has not been displayed prominently in the contract. The circuit court acknowledged that Threlkeld was correct in asserting that the contracts did not comply with the rigorous Vermont standard. The circuit court then concluded that the Vermont statute is preempted by federal law and stated:

> Because federal arbitration law governs this dispute, we must determine whether the Vermont statute is sufficiently consistent with federal law that the two may peacefully coexist. . . . The First Circuit has recently held that restrictive provisions similar to those found in the Vermont statute are preempted by federal law. . . .
>
> We agree with the First Circuit that state statutes such as the Vermont statute directly clash with the Convention and with the Arbitration Act because they effectively reincarnate the former judicial hostility towards arbitration. Accordingly <u>we hold that the Convention and the Arbitration Act preempt the Vermont statute, and that the . . . arbitration provisions, as drafted, are not enforceable</u>. (Emphasis supplied.)

**32**

Threlkeld, 923 F.2d at 250. Threlkeld is clear authority for concluding that the Montana statute directly clashes with the Federal Arbitration Act and therefore is not enforceable.

In a similar manner, Bunge Corp. v. Perryville Feed and Produce (Mo.1985), 685 S.W.2d 837, addresses a similar issue. As pointed out by the Missouri court in Bunge, the Missouri statute is based on the Uniform Arbitration Act (as is the Montana statute) and contains a provision that each contract shall include a statement in 10 point capital letters which reads substantially as follows: THIS CONTRACT CONTAINS A BINDING ARBITRATION PROVISION WHICH MAY BE ENFORCED BY THE PARTIES. The Missouri Supreme Court then stated:

> It is clear that § 435.460, if applied to this case, seeks to impose a requirement for contracts to arbitrate which is in addition to the requirements of the Federal Arbitration Act. All that is apparently required under that act is contractual language and format sufficient for an ordinarily written contract. . . . If the Missouri statute applies, then a commercial contract sufficient under federal law would be in violation.
> There is a manifest violation of the supremacy clause if our statute is so applied. The Federal Arbitration Act was passed by Congress pursuant to its power to regulate interstate commerce . . . Any requirement of state law which adds a burden not imposed by Congress is in derogation of the Congressional power, and pro tanto invalid. A very recent case so holding is Southland Corp. v. Keeting. . .
> We do not hold that the Missouri statute is unconstitutional. We simply hold that it may not be applied to defeat the arbitration provision of a contract which is within the coverage of the federal statute. . . . (Citations omitted.) (Emphasis supplied.)

Bunge, 685 S.W.2d at 839. The Bunge conclusion is directly applicable to our present case. If our Montana statute applies to the present case, then a commercial contract sufficient under

33

federal law would be in violation of the Montana statute even though it meets the requirement of the Federal Arbitration Act. As a result, even if we accept the majority opinion conclusion that the Montana code section applies, I would hold that Montana law may not be applied to defeat the arbitration principles of a contract which is clearly within the coverage of the Federal Arbitration Act.

The District Court held that the Federal Arbitration Act required that the present suit should be stayed until the arbitration has been held in accordance with the terms of the agreement. I would affirm that holding.

_____
Justice

Chief Justice J. A. Turnage concurs in the foregoing dissent.

_____
Chief Justice

34

Justice Karla M. Gray, dissenting.

I respectfully dissent from the Court's opinion on both issues presented therein. I write separately because the reasons for my dissent are not altogether identical to those which form the basis for Justice Weber's dissent.

With regard to issue one, I conclude that the franchise agreement entered into between the Casarottos and DAI was governed by Connecticut law. It is my view that the Court's analysis of this issue is incomplete and erroneous.

I agree with the Court's synopsis of our decision in Emerson v. Boyd and, on the basis that the agreement before us does include a choice of law provision, on the inapplicability of that decision to the case before us. In my view, Youngblood also is not on point here, since that case did not relate to whether a statute represents a statement of public policy by the Montana legislature and, if so, the extent of that statement of public policy.

I agree with the Court that Montana has a materially greater interest than Connecticut in the contract issue presented and that, absent an "effective" choice of law by the parties, Montana law would apply. I disagree with the remainder of the Court's discussion and analysis on this issue.

My primary concern is that the Court neither presents nor discusses the specific language contained in the statutory notice requirement. That statute provides that "[n]otice <u>that a contract is subject to arbitration pursuant to this chapter</u> shall be typed

35

in underlined capital letters on the first page of the contract; . . . ." Section 27-5-114(4), MCA. By its terms, the franchise agreement before us is subject to Connecticut law, not "this chapter"--the MUAA. The legislature's specific limitation on the applicability of the notice requirement is clear and unambiguous; under such a circumstance, we are obligated to so interpret it (Curtis v. Dist. Court of 21st Jud. Dist. (Mont. 1994), 879 P.2d 1164, 1166, 51 St.Rep. 776, 778) and conclude that the notice requirement is not applicable to the contract before us. Since the statute is inapplicable by its terms to the contract, it cannot form the basis of a public policy broad enough to negate the parties' choice of Connecticut law.

The Court does not even address the specific statutory language, preferring to resort inappropriately to generalized legislative history for its overly broad interpretation of the extent to which the notice requirement applies and the extent to which the legislature adopted the notice requirement as a public policy. Had the legislature intended the notice requirement to apply to every arbitration agreement entered into by a citizen or resident of Montana, notwithstanding that some other jurisdiction's law would otherwise apply, it would have done so; it did not. It is inappropriate for the Court to judicially broaden the legislature's clear statute in the guise of a conflict of law analysis.

With regard to issue two, I conclude that even if the Court were correct regarding the applicability of Montana's notice

36

requirement under conflict of law principles, that requirement is preempted by the Federal Arbitration Act (FAA). Therefore, I also dissent from the Court's opinion on this issue.

The Court suggests that the United States Supreme Court's Volt decision was a departure from its earlier Southland/Perry line of cases. It then presents an inadequate analysis of Volt. Finally, the Court concludes, purportedly under a Volt analysis, that Montana's notice requirement does not undermine the goals and policies of the FAA. Nothing could be further from the truth.

In Southland, the United States Supreme Court was faced with a California statute which required judicial consideration of certain claims brought under it; the California courts held that the statute precluded arbitration under an agreement containing an arbitration provision. Determining that the FAA was a substantive rule applicable in state courts by which Congress intended "to foreclose state legislative attempts to undercut the enforceability of arbitration agreements," the Supreme Court held that the California statute violated the supremacy clause. Southland was decided in 1984.

In 1987, the Supreme Court decided Perry, another California case involving a different California statute which--by its terms-- provided that legal actions for the collection of wages could be maintained notwithstanding an agreement to arbitrate such claims. Again the California courts denied a motion to compel arbitration under the parties' agreement, favoring their legislature's effort to render arbitration agreements unenforceable. And again the

37

United States Supreme Court reversed, quoting its Southland language that Congress intended to foreclose state legislatures from undercutting the enforceability of arbitration agreements. For additional clarity, the Supreme Court added "'We see nothing in the [FAA] indicating that the broad principle of enforceability is subject to any additional limitations under state law.'" Perry, 482 U.S. at 489-90 (citations omitted). Southland and Perry are, as the Court notes, consistent with each other.

In 1989, the Supreme Court decided Volt. There, faced with yet another California statute and another decision from the California courts denying a motion to compel arbitration on the basis of the state statute, the Supreme Court affirmed. Contrary to this Court's suggestion, Volt is entirely consistent with--and not a retrenchment from--Southland and Perry. All three cases require this Court to conclude that Montana's notice requirement is preempted by the FAA.

In Volt, the parties had specifically agreed to submit disputes under their contract to arbitration under the California arbitration statutes. The California arbitration statute at issue in Volt differed markedly from those in Southland and Perry. As noted above, the earlier cases involved statutes which clearly undercut the enforceability of arbitration agreements. In Volt, however, the statute--part of the California Arbitration Act-- merely allowed a court to stay arbitration pending resolution of related litigation; the right to arbitrate remained. The issue before the Supreme Court was the same as in the earlier cases:

38

whether the stay provision would undermine the goals and policies of the FAA.

The Supreme Court reiterated that the purpose of the FAA was to enforce arbitration agreements entered into by parties, and specifically noted the parties' agreement to apply California's arbitration rules, one of which permitted the stay of arbitration pending related litigation. On these facts, including the parties' choice of California arbitration law and that that law permitted a stay--but not a voiding--of arbitration, the Supreme Court held that enforcing the California stay provision did not frustrate the policy behind the FAA of enforcing arbitration agreements.

The Court's opinion fails--or refuses--to recognize two important differences between Volt and the case presently before us. First, the Supreme Court in Volt relied heavily on the fact that the parties had affirmatively chosen California arbitration law, including the stay statute, to govern their agreement. Second, the stay statute did not undercut, undermine or render unenforceable the parties' agreement to arbitrate.

Here, the parties did not affirmatively choose Montana arbitration law, which includes the notice requirement, to govern their agreement. They chose Connecticut law.

Moreover, it is clear under Southland, Perry and Volt that Montana's notice requirement is preempted by the Federal Arbitration Act. The reason for this constitutes the second important difference between this case and Volt: here, the application of the notice requirement is not merely a procedural

39

matter; indeed, it totally undermines the purposes of the FAA by rendering the parties' arbitration agreement unenforceable. This is precisely the result prohibited by the United States Supreme Court in all three of the cases discussed herein and in the Court's opinion on this issue.

I would affirm the District Court's grant of defendants' motion to stay judicial proceedings pending arbitration of plaintiffs' claims.

_____
Justice

Chief Justice J.A. Turnage joins in the foregoing dissent of Justice Karla M. Gray.

_____
Chief Justice